J-A09026-16

2016 PA Super 253

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JASON ROBERT RANDOLPH | |
| Appellant | No. 1246 MDA 2015 |

Appeal from the Judgment of Sentence July 14, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0000594-2013

BEFORE: FORD ELLIOTT, P.J.E., JENKINS, J., and PLATT, J.[*]

OPINION BY JENKINS, J.:                    **FILED NOVEMBER 16, 2016**

Jason Randolph appeals from his aggregate judgment of sentence of 5½-11 years' imprisonment for possession with intent to deliver a controlled substance, possession of a controlled substance, possession of drug paraphernalia and possession of an instrument of crime.[1] Randolph contends that the trial court erred in denying his motion to suppress all evidence that Corporal Brett Hanlon of the State Police seized from a box welded to his motor vehicle following a traffic stop on Interstate 80.

Although Corporal Hanlon obtained valid consent from Randolph to search the vehicle at the scene of the traffic stop, and although the corporal

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), (a)(16) and (a)(32), and 18 Pa.C.S. § 907(a), respectively.

correctly decided to apply for a warrant to search the box, the application failed to establish probable cause that the box would contain contraband or evidence of crime. Therefore, we vacate Randolph's judgment of sentence and remand for further proceedings consistent with this opinion.

On March 7, 2013, Randolph was arrested following a traffic stop on Interstate 80 and the execution of the search warrant for the box welded to his motor vehicle. The trial court held a suppression hearing and subsequently entered an order denying Randolph's motion to suppress. The case proceeded to trial, and a jury found Randolph guilty of all charges.

On June 14, 2015, the trial court imposed sentence. On June 20, 2015, Randolph filed a notice of appeal. Both Randolph and the trial court complied with Pa.R.A.P. 1925.

Randolph raises three issues in this appeal:

1. Did the suppression court err in holding that the Commonwealth presented sufficient evidence that [Randolph's] consent to search was not the product of duress and coercion?

2. Did the suppression court err in finding that the search warrant for [Randolph's] vehicle contained sufficient probable cause to justify its issuance?

3. Did the trial court err in permitting the Commonwealth to present hearsay testimony from a trooper in testifying about reports from other troopers that discussed the fingerprint and cell phone analysis?

Brief For Appellant, at 4.

Preliminarily, we address a jurisdictional issue. On June 24, 2015 -- after Randolph filed his notice of appeal but within ten days after imposition of sentence -- the Commonwealth filed a motion to modify Randolph's sentence. On September 18, 2015, the trial court denied the Commonwealth's motion. In this Court, the Commonwealth has moved to quash Randolph's appeal as premature due to the filing of the Commonwealth's motion to modify sentence within ten days after imposition of sentence.

We deny the Commonwealth's motion to quash. Pa.R.A.P. 905(a)(5) provides: "A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Rule 905(a)(5) applies where a criminal defendant files an appeal followed by the Commonwealth's filing of a timely motion to modify sentence. Comment, Pa.R.Crim.P. 720; Darlington, Pennsylvania Appellate Practice, § 905:3. Pursuant to Rule 905(a)(5), we treat Randolph's appeal as timely filed after entry of the order denying the Commonwealth's motion to modify.

In his first two arguments on appeal, Randolph objects to the denial of his motion to suppress. In an appeal from the denial of a motion to suppress,

> [our] standard of review … is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the

suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where … the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [] plenary review.

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa.2010).

Corporal Hanlon was the lone witness at Randolph's suppression hearing, and the Commonwealth also submitted a videotape of the traffic stop into evidence. The trial court's findings of fact are consistent with Corporal Hanlon's testimony and the videotape.

Corporal Hanlon, a state trooper for 18 years, was assigned to the Bureau of Emergency Special Operations in the K-9 unit. On the morning of March 7, 2013, Corporal Hanlon's patrol vehicle was parked on I-80. A K-9 dog, Draco, accompanied the corporal in his patrol vehicle. Suppression Hearing ("SH"), at 11-12.

At approximately 10:30 a.m., Randolph drove his Chrysler Town & Country minivan past the corporal's parked patrol cruiser on I-80. Corporal Hanlon initiated a traffic stop because the minivan's windows contained an illegal tint and because he could not see the registration on the license plate. The driver parked the vehicle very close to the fog line. Corporal Hanlon

- 4 -

referred to this as "white lining", a technique he has observed drug traffickers use to expedite the traffic stop by discouraging the police officer from approaching the driver side of the vehicle.

Randolph was driving the van along with one passenger. Corporal Hanlon requested Randolph's license, registration, and insurance and returned to his patrol cruiser with these documents. SH, at 14-18.

Corporal Hanlon ran Randolph's information and found that he had a prior drug trafficking conviction. After about twenty minutes, the corporal returned to Randolph's vehicle and directed him to exit the van. The corporal observed that there were no rear seats in the van. While he explained the Vehicle Code violations to Randolph, a second trooper, Trooper Rowland, operating a marked patrol cruiser, arrived on scene and joined the conversation. Corporal Hanlon advised Randolph that he was issuing a written warning and told Randolph that he was free to leave. SH, at 19, 22.

Moments later, however, Corporal Hanlon asked whether he could ask Randolph additional questions about his trip. The corporal did not tell Randolph that he did not have to answer any further questions. Randolph told the corporal that he and his wife had just moved from South Carolina to New Jersey, which was why there were no seats in his van. He said that she had just had a baby, and that he was travelling from Newark, New Jersey to Columbus, Ohio to visit a family member in the hospital. He added that his aunt's grandmother was in a car accident and was hospitalized with a broken

leg. When he repeated his account, however, he said that that he was going to visit his aunt instead of his aunt's grandmother. Randolph stated he had no luggage in the van and did not plan on staying the night in Columbus, even though it was a 16-hour round trip. When asked, Randolph could not name the hospital in Columbus that he was visiting. Trooper Hanlon found it strange that Randolph was traveling far away from home without his wife or their baby. Randolph admitted that he had a prior drug-related conviction. Trooper SH, at 23-28.

During this conversation, Trooper Rowland approached the passenger in the minivan and questioned him. The passenger claimed to be from New York, which Corporal Hanlon found strange because Randolph was from South Carolina. SH, at 23-28.

Corporal Hanlon asked Randolph for consent to search the minivan, and Randolph consented. Both Defendant and the passenger were patted down and asked to stand in front of the vehicle. The K-9, Draco, searched the vehicle but did not alert to anything. Corporal Hanlon and Trooper Rowland then searched the vehicle. Corporal Hanlon saw no luggage in the minivan, but he heard multiple cell phones ringing and seized the cell phones. When he checked between the driver and passenger seats, he observed a steel box extending downward from the floor that was welded to the vehicle. The box did not match the remainder of the undercarriage. Suspecting that the box contained drugs, Trooper Hanlon questioned

Randolph about the box, and Randolph's demeanor immediately became defensive. The corporal impounded the vehicle and obtained a warrant to search the compartment. SH, at 28-35.

It took considerable effort to open the compartment, which was only accessible through a door underneath the passenger seat of the minivan. The door was battery powered and could only be opened by removing the passenger door and applying power through wires connected to the door. The corporal managed to open the compartment by attaching alligator clips to the door and applying power. Inside the compartment were 550 grams of cocaine and a digital scale. SH, at 35-39.

Preliminarily, Randolph does not dispute that the initial traffic stop was legal. Nor could he, because the evidence demonstrates that Corporal Hanlon had probable cause to believe that Randolph violated the Vehicle Code by driving with tinted windows. *See* 75 Pa.C.S. § 4524(e)(1) ("no person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle").

We conclude that Randolph's consent to search his vehicle was valid, because the traffic stop had become a mere encounter by the time Corporal Hanlon obtained Randolph's consent, and because Randolph's consent was voluntary.

*Mere encounter.* The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution both protect against unreasonable searches and seizures. U.S. Const. amend. IV; Pa. Const. art. I, § 8; **Schneckloth v. Bustamonte**, 412 U.S. 218, 219 (1973); **Commonwealth v. Cleckley**, 738 A.2d 427, 433 (Pa.1999). A search conducted without a warrant is constitutionally impermissible unless an established exception applies. **Commonwealth v. Slaton**, 608 A.2d 5, 8–9 (Pa.1992). A consensual search is one such exception, and the central inquiries in consensual search cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent, and the voluntariness of the consent given. **Cleckley**, 738 A.2d at 433. To establish a valid consensual search, the Commonwealth must first prove that the individual consented during a legal police interaction. **Commonwealth v. Strickler**, 757 A.2d 884, 889 (Pa.2000). Where the interaction is lawful, the voluntariness of the consent becomes the exclusive focus. **Id.;** **Commonwealth v. Acosta**, 815 A.2d 1078, 1083 (Pa.Super.2003) (*en banc* ).

Pennsylvania case law recognizes three categories of interaction between police officers and citizens. The first is a "mere encounter," which need not be supported by any level of suspicion. **Acosta**, 815 A.2d at 1082. The second is an "investigative detention," which must be supported by reasonable suspicion. **Id.** This interaction "subjects a suspect to a stop and

a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest." ***Commonwealth v. Phinn****,* 761 A.2d 176, 181 (Pa.Super.2000). The third category, a "custodial detention," must be supported by probable cause. ***Id****.* "The police have probable cause where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." ***Commonwealth v. Hernandez****,* 935 A.2d 1275, 1284 (Pa.2007).

In ***Commonwealth v. Strickler****,* 757 A.2d 884 (2000), our Supreme Court analyzed when a police interdiction can devolve into a mere encounter following a traffic stop where police continue to question an individual after the reason for the traffic stop has concluded. The Court ruled that after police finish processing a traffic infraction, the determination of whether a continuing interdiction constitutes a mere encounter or a constitutional seizure centers upon whether the individual would objectively believe that he was free to end the encounter and refuse a request to answer questions. The Court adopted a totality-of-the-circumstances approach and articulated a non-exclusive list of factors to be used in making this assessment. These factors include 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location and time of the interdiction; 6) the content of the questions and statements;

7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, … thus suggesting to a citizen that his movements may remain subject to police restraint," *Id.* at 898; and 9) whether there was an express admonition to the effect that the citizen-subject is free to depart, which "is a potent, objective factor." *Id.* at 899. With regard to the last two factors, **Strickler** observed:

> The degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless … thus suggesting to a citizen that his movements may remain subject to police restraint, is a pertinent factor … '[F]ew motorists would feel free ... to leave the scene of a traffic stop without being told they might do so.' While recognizing … that the admonition to a motorist that he is free to leave is not a constitutional imperative, the presence or absence of such a clear, identified endpoint to the lawful seizure remains a significant, salient factor in the totality assessment.

*Id*. at 898-99.

In this case, the trial court held that the traffic stop had devolved into a mere encounter when Corporal Hanlon told Randolph that he was free to leave. Corporal Hanlon's questions to Randolph after telling him that he was free to leave took place during a mere encounter, not a detention. The trial court reasoned:

> The interaction occurred in the mid-morning. Corporal Hanlon did not have sirens on his vehicle. The initial investigative detention described by Corporal Hanlon was not coercive in nature and the interaction between the Corporal and [Randolph] was calm and cordial. There was no physical contact prior to

- 10 -

consent for the search being given and [Randolph's] movements were minimally directed in that he was asked to step out of the vehicle to the rear to receive the warning. [Randolph] was given a written warning and told that he was free to leave. It was only after both were headed toward their vehicles that Corporal Hanlon again spoke to [Randolph].

Pa.R.A.P. 1925 Opinion, at 5. We agree with this analysis. *See Commonwealth v. By*, 812 A.2d 1250, 1258 (Pa.Super.2002) (following valid traffic stop at night, and after telling defendant he was free to leave, officer's continued questioning took place during mere encounter, where officer spoke casually and non-threateningly to passengers, stood on the passenger's side of the vehicle instead of near driver's door or in front of the vehicle, and had no contact with defendant before telling him that he was free to leave).[2]

_____

[2] Had the interaction between Corporal Hanlon and Randolph not devolved into a mere encounter, Corporal Hanlon would have needed reasonable suspicion to continue questioning Randolph after telling him that he was free to leave. We note, by way of dicta, that the circumstances of this case provided Trooper Hanlon with reasonable suspicion to continue questioning Randolph.

During a traffic stop, an officer may develop reasonable suspicion to detain the vehicle occupants for further investigation. We have defined "reasonable suspicion" as follows:

[T]he officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot … In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making

*(Footnote Continued Next Page)*

J-A09026-16

*(Footnote Continued)* ————————————————

this determination, we must give due weight … to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Commonwealth v. Smith***, 917 A.2d 848, 852 (Pa.Super.2007) (citations omitted). The officer "may ask the detainee a moderate number of questions" during a traffic stop "to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." ***Berkemer v. McCarthy***, 468 U.S. 420, 439 (1984). "[I]f there is a legitimate stop for a traffic violation … additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions." ***Commonwealth v. Chase***, 960 A.2d 108, 115 n.5 (Pa.2008). Even innocent factors, viewed together, may create reasonable suspicion that criminal activity is afoot. ***See Commonwealth v. Caban***, 60 A.3d 120, 129-30 (Pa.Super.2012) (following valid traffic stop for speeding, officer had reasonable suspicion of criminal activity to justify continued detention of driver and passenger; driver acted nervously, car was owned by third party not present in vehicle, answers provided by driver and passenger to basic questions regarding their destination were inconsistent, and various masking agents, including air fresheners, canisters of perfume, and bottle of odor eliminator, were present in vehicle).

Corporal Hanlon observed several factors that gave him reasonable suspicion to believe that criminal activity was afoot. Randolph parked very close to the fog line, which Corporal Hanlon testified was a technique used by drug traffickers to discourage officers from approaching the driver side of the vehicle. Although Randolph was driving from Newark to Columbus, there were no suitcases or back seats in the vehicle, an odd circumstance for such a long trip. In addition, Randolph had a prior drug trafficking conviction. This combination of factors provided reasonable suspicion to detain Randolph and continue an investigation into possible criminal wrongdoing. ***See Caban***, 60 A.3d at 129-30.

We also note that decisions from other jurisdictions indicate that a prior conviction, by itself, does not create reasonable suspicion. ***See***, ***e.g.***, ***United States v. Foster***, 634 F.3d 243 (4th Cir.2011) (defendant's "criminal record" not sufficient basis for stop, even with generalized
*(Footnote Continued Next Page)*

*Consent.*[3]  The Commonwealth bears the burden of proving that the defendant consented to a warrantless search.  **See Commonwealth v. Acosta**, 815 A.2d 1078, 1083 (Pa.Super.2003) (*en banc*).  To establish a voluntary consensual search, the Commonwealth must prove "that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances."  **Strickler**, 757 A.2d at 901.

There is no shortage of decisions relating to consent.  A convenient starting point is two decisions issued on the same date by our Supreme Court:  **Strickler** and **Commonwealth v. Freeman**, 757 A.2d 903 (Pa.2000).

In **Strickler***,* a police officer observed a car parked along a country road.  Two men were standing near the car and appeared to be urinating. After questioning the men and verifying the documentation for the vehicle and the driver, the officer returned the documents to the driver.  At that

---

*(Footnote Continued)*

conclusory assertion defendant presently "under investigation").   Here, however, there were other suspicious details in addition to Randolph's prior conviction.

[3] As a threshold matter, when, as here, the defendant is accused of a possessory crime, he must establish a legally cognizable expectation of privacy in the area searched.  **Caban**, 60 A.3d at 126. In this case, the record demonstrates that Randolph was the registered owner of the vehicle that was the subject of the search.  Accordingly, Randolph had a reasonable expectation of privacy in the areas of the vehicle that Corporal Hanlon and Trooper Rowland searched.

- 13 -

time, the officer informed Strickler that it was not appropriate to stop along the road and urinate on someone's property. The officer began walking back to his cruiser when he turned and asked Strickler if there was anything illegal in the vehicle. When Strickler stated that there was not, the officer requested Strickler's consent to search the vehicle. The officer told Strickler that he was free to withhold his consent. Strickler consented to the search, which disclosed a marijuana smoking pipe.

Applying the nine-factor test delineated above, our Supreme Court held that Strickler's consent was voluntary, even though the officer never expressly told Strickler that he was free to leave following the initial lawful detention. **Strickler**, 757 A.2d at 900. The Court opined: "[T]he officer did not touch Strickler or direct his movements; there is no evidence of any use of coercive language or tone by the officer. We also deem significant the arresting officer's admonition to Strickler that he was not required to consent to the search." **Id**. at 900 (emphasis added). Thus, the officer's admonition that Strickler could refuse consent outweighed the officer's failure to expressly advise the defendant that he was free to leave following the initial detention. **Id**. at 901-02.

In **Freeman**, a state trooper stopped Freeman for making improper lane changes in what appeared to be a "cat and mouse" game with another car on the highway. Freeman denied having any problem with the other car.

- 14 -

The trooper gave Freeman a written warning and advised that she was free to leave, but the events that followed

> were inconsistent with [the trooper's] statement to Freeman that she was free to leave …: [the trooper] returned to Freeman's vehicle; questioned her about the second vehicle; pointed out the inconsistent statements from the vehicle's occupants when she denied traveling with that vehicle; and, ultimately and most significantly, asked her to step out of the vehicle prior to the request for consent. Such directive constituted a greater show of authority than had previously been made (other than the physical stop of Freeman's vehicle itself).

*Id*. at 907. The Supreme Court held that these events constituted an invalid seizure, because the trooper had no reasonable suspicion of criminal activity: "Even if Freeman's answer to the trooper's question, contradicting as it did the information given by the occupants of the other car, could arguably be viewed as evasive behavior," the trooper had no more than an "unparticularized suspicion or 'hunch' of criminal activity." *Id*. at 908.

As a result, Freeman's consent was invalid, mandating suppression of the fruits of the resulting search:

> The detention that preceded Freeman's consent to search was unlawful, and Freeman's consent, even if voluntarily given, will not justify the otherwise illegal search unless the Commonwealth can demonstrate that Freeman's consent was an independent act of free will and not the product of the illegal detention … Here, although we do not view the trooper's actions as flagrant, the record does not establish the necessary break in the sequence of events that would isolate Freeman's consent from the prior coercive interaction. To the contrary, the evidence supports the conclusion that the trooper's initiation of a second seizure and receipt of Freeman's consent were integrally connected.

*Id*. at 909.

- 15 -

In the wake of **Strickler** and **Freeman**, this Court has issued many decisions relating to the issue of consent during traffic stops. In some, we held that the totality of circumstances proved voluntary consent;[4] in others, we determined that consent was involuntary.[5]

---

[4] **See Caban**, 60 A.3d at 131-32 (vehicle passenger's consent to search of vehicle that was owned by his father and driven by his friend was voluntary, where there was no evidence of police abuses, aggressive tactics, physical contact, or use of physical restraints any time during the detention, passenger was advised that he was free to leave, passenger initially refused consent to search, and officer accepted refusal without argument but merely explained that passenger could either consent or wait for drug-sniffing dog to arrive); **Commonwealth v. Kemp**, 961 A.2d 1247, 1261 (Pa.Super.2008) (following valid investigatory stop, defendant voluntarily consented to search of vehicle, even though investigating officer did not inform defendant that he could refuse to consent to search; there was no excessive police conduct, no physical contact occurred between police and defendant, officer did not display his weapon, officer's order to defendant's companion to exit car was necessitated by fact that companion was not licensed driver and had to move out of driver's seat, defendant did not lack maturity or sophistication and was not intellectually incapable of exercising free will, and character of initial investigative detention, the traffic stop, was routine); **Commonwealth v. Bell**, 871 A.2d 267, 274 (Pa.Super.2005) (*en banc*) (defendant voluntarily consented to warrantless search of vehicle, where defendant understood all of his rights, detective informed defendant that police knew he was there to deliver drugs and that officer observed defendant put package on floor of car, detective invited defendant to cooperate, detective did not coerce defendant into making statement with threats or actions, defendant, having waived his right to remain silent and to an attorney, admitted having an ounce of cocaine for delivery to female at particular location, defendant signed consent form that detective read to him while defendant appeared to read along, and before signing consent form, defendant confirmed that he spoke English and was not under influence of drugs or alcohol); **By**, 812 A.2d at 1258 (following valid traffic stop at night, officer obtained defendant's consent to search vehicle through non-coercive means; although two other officers were present, officer spoke casually and non-threateningly, told defendant he was free to leave, did not restrain defendant's movement by use or threat of force, asked defendant if he could

*(Footnote Continued Next Page)*

search vehicle, and reminded defendant that he was free to leave prior to obtaining consent); *cf. **Commonwealth v. Reid***, 811 A.2d 530, 548 (Pa.2002) (defendant's consent to search his jacket, boots, motel room, and truck, during consensual encounter at police barracks that involved questioning about deaths of defendant's estranged wife and stepdaughter, was voluntary, where, *inter alia*, trooper read consent form to defendant explaining his right to refuse search and defendant signed form).

[5] *See **Commonwealth v. Tam Thanh Nguyen***, 116 A.3d 657, 669 (Pa.Super.2015) (driver's consent to search vehicle vitiated by taint of illegal continued investigatory detention of driver and defendant following conclusion of traffic stop that was not justified by reasonable suspicion of criminal activity; driver consented to search only moments after state trooper re-initiated contact with defendant after advising that driver was free to leave, no intervening circumstances diminished coercive atmosphere of illegal detention or otherwise justified search, and at time of consent, vehicle was surrounded by two troopers and trooper had just repeated questions regarding driver's excessive nervous and apologetic demeanor); ***Commonwealth v. Moyer***, 954 A.2d 659, 668-69 (Pa.Super.2008) (*en banc*) (defendant's consent held involuntary following investigatory stop that itself was not justified by reasonable suspicion; officer reintroduced questioning after returning defendant's documents and telling him he was free, defendant walked from rear of car to car door when officer stopped him again, there was no precise end to traffic stop, two armed and uniformed police officers stood near defendant, who was alone and isolated outside car at night on rural, unlit road when he was asked if he would answer questions, police had activated flashing lights and directed bright white police spotlight at car, defendant was not informed that he did not have to answer further questions, officer told defendant results of his criminal history check and accused him of past drug activity, and defendant was asked if there were controlled substances or paraphernalia in his car or on his person); ***Commonwealth v. Acosta***, 815 A.2d 1078, 1085-87 (Pa.Super.2003) (*en banc*) (consent held involuntary despite prior valid stop for suspended license plate, where officer withheld defendant's vehicular documentation, other officers and marked police cars were present with flashing lights in close proximity to defendant, and officer never expressly informed defendant that he was free to leave or that he was free not to consent to search of vehicle).

Relying on **Freeman**, **Nyugen** and **Moyer**, Randolph argues that it was improper for Corporal Hanlon to re-initiate questioning after advising Randolph that he was free to leave. Each of these decisions held that the defendant's consent was invalid, because the officer continued to question the defendant despite lacking reasonable suspicion to detain the defendant further and despite advising the defendant that he was free to leave.

In **Freeman**, **Nyugen** and **Moyer**, the interactions between the defendants and officers did not transform into mere encounters. As a result, the officers needed (but lacked) reasonable suspicion to continue questioning the defendants. Here, in contrast, Corporal Hanlon's interaction with Randolph had become a mere encounter, making further questioning permissible. The evidence demonstrates that during this mere encounter, Randolph gave voluntary consent to search his vehicle. The encounter took place in an open location on a public highway in broad daylight. The questioning was not exceedingly long, and the corporal's questioning was not repetitive or deceptive in any way. There were no police abuses or aggressive tactics. Nor did the officers use threatening demeanor, physical contact or physical restraints anytime during the detention.

For these reasons, Randolph's first argument is devoid of merit.

In his second issue on appeal, Randolph argues that Corporal Hanlon's search warrant application failed to establish probable cause to search the box welded to the undercarriage of Randolph's vehicle. We agree.

The Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution each require that search warrants be supported by probable cause. *Commonwealth v. Edmunds*, 586 A.2d 887, 899 (Pa.1991) "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Thomas*, 292 A.2d 352, 357 (Pa.1972).

In *Illinois v. Gates*, 462 U.S. 213 (1983), the United States Supreme Court established the "totality of the circumstances" test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In *Commonwealth v. Gray*, 503 A.2d 921 (Pa.1986), our Supreme Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. *Gray* described this test as follows:

> Pursuant to the 'totality of the circumstances' test set forth by the United States Supreme Court in *Gates*, the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.... It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to

- 19 -

establish probable cause in a common-sense, non-technical manner.

* * *

[Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.

*Commonwealth v. Torres*, 764 A.2d 532, 537–38, 540 (Pa.2001). "A grudging or negative attitude by reviewing courts towards warrants ... is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." *Gates*, 462 U.S. at 236; *see also United States v. Leon*, 468 U.S. 897, 914 (1984) ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination").

"A police officer's experience may fairly be regarded as a relevant factor in determining probable cause." *Commonwealth v. Thompson*, 985 A.2d 928, 935 (Pa.2009). An officer, however, cannot simply reference "training and experience abstract from an explanation of their specific application to the circumstances at hand." *Id.* "A court cannot simply conclude that probable cause existed based upon nothing more than the number of years an officer has spent on the force. Rather, the officer must

demonstrate a nexus between his experience and the search, arrest, or seizure of evidence." *Id*.  Indeed, a factor becomes relevant only because it has some connection to the issue at hand.[6]  *Id*.

In this case, after obtaining Randolph's valid consent to search his vehicle, Corporal Hanlon searched the vehicle and discovered the box welded to the undercarriage.  Corporal Hanlon then applied for a search warrant to open the box.  His affidavit of probable cause referenced details that we have discussed above, such as the absence of rear seats, Randolph's inconsistent statements about whom he was visiting in the Columbus, Ohio

_____

[6] We also find persuasive Professor LaFave's analysis that a police officer must do more to establish his level of experience than make a cursory assertion of its existence and relevance:

> [T]he probable cause determination must ultimately be made by a judicial officer, who is not an 'expert' in matters of law enforcement, and … consequently it is incumbent upon the arresting or searching officer to explain the nature of his expertise or experience and how it bears upon the facts which prompted the officer to arrest or search.  For example, if an officer at a hearing on a motion to suppress were to say that he made the arrest because he saw what he as an expert recognized as a marijuana cigarette, this is not a showing of probable cause.  Under the probable cause standard, it must 'be possible to explain and justify the arrest to an objective third party,' and this is not accomplished by a general claim of expertise. On the other hand, if the officer testifies fully concerning his prior experience with marijuana cigarettes and explains in detail just how it is possible to distinguish such a cigarette from other hand-rolled cigarettes, this testimony cannot be disregarded by the judge simply because it involves expertise not shared by the judge.

LaFave, 2 Search & Seizure § 3.2(c) (5th ed. 2015).

hospital, and his inability to name the hospital. The affidavit also included a detail not mentioned during the suppression hearing: the passenger in the vehicle told Trooper Rowland that they were going to Cleveland, Ohio, not Columbus.

Corporal Hanlon then described the search of Randolph's vehicle as follows:

> I … initiated a canine search of the vehicle with [c]anine 'Draco'. During the search, Draco increased his breathing around the driver's seat floor area, but did not indicate. I then initiated a hand search of the vehicle with Tpr. Rowland. During the search, we located multiple cell phones[,] one of which was ringing, [but] no luggage to indicate a long trip. I then looked at the undercarriage of the vehicle and observed an aftermarket modification between the floor (sic) that did not match the remainder of the undercarriage. Based on my training and experience[,] I recognized this modification to be a hidden compartment commonly used to transport guns, drugs and U.S. currency. I related this information to Randolph and noticed a drastic change in attitude … Canine Draco is trained and certified by the Pennsylvania State Police to detect the odors of cocaine, heroin, marijuana and methamphetamines.

SH, Commonwealth Exhibit 3.

We recognize that we have a duty to examine search warrant applications through the lens of common sense and not in the manner of grudging, hypertechnical perfectionists. But even when construed in this light, we still conclude that the trooper's affidavit did not establish probable cause to search the box.

The Commonwealth asserts that the following factors created probable cause: (1) the absence of seats and luggage in the vehicle, (2) the discovery

of multiple cell phones, one of which was ringing, (3) Randolph's inconsistent accounts of whom he was visiting in Columbus, (4) his inability to name the hospital he was driving to in Columbus, (5) the passenger's claim that they were driving to Cleveland instead of Columbus, and (6) the hidden compartment welded to the undercarriage of the vehicle, which Trooper Hanlon claimed was a common device for transporting drugs, weapons and money. We cannot fault Corporal Hanlon for finding these facts suspicious, but they did not give rise to probable cause.

Corporal Hanlon's averments relating to the hidden compartment were insufficient for two reasons. First, the police dog, Draco, did not alert when it sniffed the area in which Corporal Hanlon subsequently discovered the compartment. While this alone did not *defeat* probable cause,[7] neither did it elevate the likelihood that the corporal would find contraband or evidence of crime in the hidden compartment. **Torres**, 764 A.2d at 537. Second, Corporal Hanlon failed to explain how his "training and experience" led him to recognize that the compartment was "commonly used to transport guns, drugs and U.S. currency." He neglected to list what classes he has attended or certifications he has received on this subject, the number or type of cases he has participated in where officers discovered hidden compartments

---

[7] **Commonwealth v. Brown**, 924 A.2d 1283, 1289 (Pa.Super.2007) (trained dog's failure to alert "is but one factor to be considered in adjudging whether the totality of the circumstances establishes probable cause").

containing drugs or weapons, or even how long he has been a law enforcement officer. Thus, his claim of "knowledge and experience" was an empty phrase that failed to tilt the scales toward probable cause. **Thompson**, 985 A.2d at 935 (officer's claim of "knowledge and experience" does not give rise to probable cause without "explanation of their specific application to the circumstances at hand").

Nor did discovery of the hidden compartment establish probable cause when viewed in conjunction with the other five facts observed by Corporal Hanlon. Collectively, these details indicate that Randolph and the other vehicle occupant were taking a lengthy road trip without luggage or seats in the rear of the vehicle, but with multiple cell phones in their possession; that they gave inconsistent accounts about their travel plans and destination; and that the vehicle had a hidden compartment -- an unusual set of circumstances, but not enough for a search warrant, because they did not create a "fair probability" that contraband or evidence of crime would be found inside the hidden compartment. **Torres**, 764 A.2d at 537. Had Corporal Hanlon augmented these facts by describing his "knowledge and experience" vis-à-vis hidden vehicle compartments (or other details that he found suspicious), his affidavit might well have furnished probable cause. This subject matter, however, was missing from the affidavit, and we must judge this affidavit by what it includes, not by what potentially helpful information it omits.

Judge Platt's concurring and dissenting statement contends that our "focus on the level of detail in the recitation of Corporal Hanlon's training, knowledge and experience misses the big picture and reweighs the evidence before the suppression court." Concurring and Dissenting Statement, at 2. Judge Platt further asserts that Corporal Hanlon's experience "may be regarded as **a** relevant factor" under ***Thompson***, but that he was not "**required** to demonstrate a fact-specific nexus between his experience and probable cause for the search." ***Id***. at 3 (emphasis in original).

Judge Platt obviously is correct that ***Thompson*** calls experience "**a** relevant factor" (as opposed to "the relevant factor" or "the only relevant factor"). ***Thompson***, 985 A.2d at 935. And because experience is only "a relevant factor," there may be occasions where experience is not critical to the probable cause calculus. For example, had Draco alerted to the area in which Corporal Hanlon subsequently discovered the compartment, we doubt that it would have been necessary for Trooper Hanlon to describe his experience. But Draco did not alert, so in the "big picture" of this case, Corporal Hanlon's experience was essential to tip the balance from mere suspicion to probable cause. What knowledge, training or experience did Corporal Hanlon have that reasonably indicated that the hidden compartment was used to store criminal contraband? His affidavit did not say – and due to this omission, his affidavit only gave rise to suspicion of criminal activity but not probable cause.

During oral argument, the Commonwealth suggested that even if the search warrant was deficient, Corporal Hanlon still had the right to open the hidden compartment by virtue of Randolph's verbal consent to search the vehicle. We do not agree that Randolph's consent extended this far. We have held that general consent to search a vehicle extends to closed, but readily opened, containers discovered inside the car. *Commonwealth v. Yedinak*, 676 A.2d 1217, 1220 (Pa.Super.1996). Conceivably, general consent might also permit opening a closed container by unscrewing several screws from its cover without causing structural damage. *See United States v. Saucedo*, 688 F.3d 863, 866-68 (7th Cir. 2012) (collecting cases). Conversely, we do not think it reasonable to conclude that Randolph's consent extended to a hidden compartment that he kept locked and concealed from view and which Corporal Hanlon could open only by removing the passenger door and applying power through wires connected to the door. *Cf. Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991) ("it is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk").

Accordingly, we hold that the trial court erred by denying Randolph's motion to suppress.[8]

Judgment of sentence reversed; case remanded for further proceedings consistent with this opinion; Commonwealth's motion to quash appeal denied; jurisdiction relinquished.

President Judge Emeritus Ford Elliott joins the opinion.

Judge Platt files a concurring/dissenting statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/2016

_____

[8] In view of this decision, we find it unnecessary to review Randolph's final issue on appeal, an argument that the trial court erred in permitting the Commonwealth to present hearsay testimony from Corporal Hanlon concerning reports from other troopers relating to forensic analysis of cell phones seized from Randolph's vehicle.