J-S08020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEIYO DIXON, | : | |
| | : | |
| Appellant. | : | No. 2668 EDA 2017 |

Appeal from the Judgment of Sentence, July 7, 2017,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0011823-2014.

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MAY 10, 2019**

Deiyo Dixon appeals from the judgment of sentence imposed after he was convicted of possession with intent to deliver a controlled substance (PWID), persons not to possess firearms, possession of a firearm with altered manufacturer's number, and possession of an instrument of a crime.[1] Dixon asserts the police search of his girlfriend's apartment was unconstitutional, and appeals from his judgment of sentence. After careful review, we affirm.

The trial court summarized the relevant facts as presented at Dixon's suppression hearing as follows:

> [T]he Commonwealth presented the testimony of Philadelphia Police Sergeant Sylvia Young. Sergeant Young testified that, on July 17, 2014, at approximately 8:00 p.m., she and her narcotics team were conducting an investigation

---

[1] 35 Pa. P.S. §780-113(a)(30), and 18 Pa.C.S.A. §§ 6105(a)(1), 6110.2.(a), and  907, respectively.

---

*   Former Justice specially assigned to the Superior Court.

on the 2800 block of Stiles Street in Philadelphia, at which time [Dixon] was observed making suspected narcotics transactions. In the first transaction, [Dixon] was approached by an unknown black male, who handed him United States currency; in exchange, [Dixon] reached into his pants pocket and handed the male a small item, suspected narcotics. Within a few minutes, a second black male drove up to [Dixon] and engaged in a brief conversation with him, which prompted [Dixon] to enter the premises at 1223 North 29th Street. Shortly thereafter, [Dixon] emerged from the [p]remises holding small items, suspected narcotics, which he handed to the second male. Police then converged on [Dixon] and placed him under arrest.

Accompanied by two backup officers, Sergeant Young entered the exterior front door of the residence, which was ajar. It opened to a small foyer, where there was a door to a first-floor apartment on the left, and a door to a stairwell leading to the second-floor apartment on the right. Sergeant Young testified that she was advised by her surveilling officers (and given the timing of the events, she personally believed) that [Dixon] was going into the first-floor apartment. Accordingly, with their service weapons drawn, Sergeant Young and her backup officers knocked on the door to the first-floor apartment, which was answered by [Dixon's] then-girlfriend, Robin Blackwell. [Ms. Blackwell identified herself as the renter of the property.] Sergeant Young asked Ms. Blackwell if anyone was inside the premises, to which she responded in the negative. Sergeant Young's backup officers conducted a quick "clear" of the residence, at which time she and her backup officers holstered their weapons. Sergeant Young explained to Ms. Blackwell that her boyfriend ([Dixon]) was being arrested for selling narcotics, and that her apartment would be searched in one of two ways—namely, with a search warrant or with her consent. Sergeant Young further explained to Ms. Blackwell that if she provided consent, she could stop the search at any time and tell them to obtain a warrant; whereas if they obtain[ed] a warrant, the search is just executed and there is nothing that she could do. Ms. Blackwell decided to consent to the search, and signed a "consent to search" form, which the Commonwealth introduced as Exhibit "C-1".

Sergeant Young testified that, upon receiving Ms. Blackwell's verbal and written consent, she and her officers conducted a search of the residence, which yielded vast amounts of contraband (narcotics, paraphernalia and firearms)—all of which was placed before Ms. Blackwell so that she could see what was being removed. Additionally, all the items were inventoried in the consent to search form, which Ms. Blackwell further acknowledged via signature. Sergeant Young also testified that Ms. Blackwell was present/inside the entire time and there were never any threats made to her about searching the property.

[Dixon] thereafter presented the testimony of his former girlfriend, Robin Blackwell. Ms. Blackwell testified that [Dixon] was her boyfriend at the time of the above events, and had a key to the apartment. She testified that he came and went as he pleased, and stayed there three times per week; she did not know there were drugs and guns in her apartment, nor how they got there. Ms. Blackwell testified that on the evening in question, she was just waking up when two white men entered her apartment with guns drawn, asking "Where is it?" She yelled at the men to "get out" of her apartment. They allowed her to get dressed, and a black female, Sergeant Young, entered the apartment. Ms. Blackwell testified that the officers were looking around the apartment before the sergeant entered and told her that they had a warrant coming. Ms. Blackwell also testified that the officers told her that if she did not sign the consent, they would damage the apartment while searching it with a warrant—they would put holes in the walls and pull up the floors—and that if they found any contraband, she would be arrested. Ms. Blackwell further testified that Sergeant Young was not cursing or yelling at the time, but she still felt threatened. She acknowledged that she signed the consent to search form in three different places, both prior and subsequent to the search. Finally, Ms. Blackwell testified that her father is a retired police officer, which she relayed to Sergeant Young, but did not try to call her father at any time during the above events.

Trial Court Opinion, 4/20/18, at 2-5 (citations and footnotes omitted).

The trial court ultimately denied the motion to suppress, and the case proceeded to trial where Dixon was convicted of the above charges on April 25, 2016. Sentencing was deferred until a later date, at which point Dixon failed to appear. The court issued a bench warrant for Dixon's arrest. Over a year later, Dixon was apprehended on May 31, 2017. Upon consideration of a pre-sentence investigation, the court sentenced Dixon to six to twelve years' of incarceration. Dixon filed post-sentence motions, which were denied. This timely appeal follows. Both Dixon and the trial court have complied with Pa.R.A.P. 1925.

Dixon raises one issue for our review: was the consent obtained from Blackwell to search her apartment forced or coerced, and therefore, an illegal search pursuant to both the United States and Pennsylvania constitutions? **See** Dixon's Brief at 2.

Our standard of review is limited to the following:

> When presented with a challenge to the denial of a motion to suppress evidence, we are limited to determining whether the trial court's factual findings are supported by the record and whether the legal conclusions drawn from those findings are correct. In conducting our review, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. If the trial court's factual findings are supported by the record, we are bound by those facts; however, we may reverse the suppression court when it draws erroneous legal conclusions from those factual findings.

**Commonwealth v. Gonzalez**, 979 A.2d 879, 883 (Pa. Super. 2009).

The Fourth Amendment to the United States Constitution protects the right of persons in this country to be secure from "unreasonable searches and seizures." U.S. Const. Amend. IV. "Thus, pursuant to the protections of the Fourth Amendment, before a police officer may conduct a search, he must generally obtain a warrant that is supported by probable cause and authorizes the search." *Commonwealth v. Acosta*, 815 A.2d 1078, 1083 (Pa. Super. 2003) (citation omitted). A search warrant is not required, however, where a person with the proper authority "unequivocally and specifically consents to the search." *Id*.

The Commonwealth bears the burden of proving that the defendant consented to a warrantless search. *Commonwealth v. Randolph*, 151 A.3d 170, 179 (Pa. Super. 2016). To establish a voluntary consensual search, the Commonwealth must prove "that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Id*. (citation omitted). Our Supreme Court has stated that although there is no "hard and fast" list of factors that unequivocally proves voluntariness, courts should give weight to the following considerations:

> 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Commonwealth v. Gillespie*, 821 A.2d 1221, 1225 (Pa. 2003).

- 5 -

Specifically, Dixon argues that Blackwell was effectively in custody during the time of the search, making her consent invalid. He asserts that:

> The multiple police officers with their guns drawn, in a small two-room apartment created a threatening environment for [Blackwell]. She had observed these officers run toward her apartment building at night. It is unclear whether the officers were in uniform or undercover. The record also illustrates that the officers entered her small, two-room apartment without permission. Any ordinary and reasonable person would have felt threatened and coerced under the circumstances. Any ordinary and reasonable person would have felt in custody under the circumstances.

Dixon's Brief at 10. We disagree with Dixon's assessment.

This narrative of threats and coercion that Dixon lays out is largely an adoption of Blackwell's testimony. However, Blackwell's assessment of the events that occurred on July 17, 2014, are quite different than what Sergeant Young recounted in her testimony. The trial court explained that its determination as to whether Blackwell's consent was voluntary, centered on credibility determinations. The court summarized the differing versions of the encounter as follows:

> Here, the determination of voluntariness ultimately hinges on the credibility of the witnesses. That is, depending on which version of events is credited, tips the scales in favor of, or against, a finding of voluntariness. Specifically, according to the Commonwealth's witness, police knocked on the door with guns drawn, conducted a protective sweep of the residence, holstered their weapons, and then discussed Ms. Blackwell's options in providing consent to search, which she could stop at any time, or proceed via search with a warrant.

> Conversely, according to [Blackwell], police entered the residence without her permission, stormed through it with

guns drawn, asking "Where is it?" She yelled at them to "get out", which they refused to do, and they told her that they had a warrant coming. They also allegedly told her that if she did not sign the consent, they would damage the apartment while searching it with a warrant – *i.e.*, put holes in the walls and pull up the floors – and that if they found any contraband, she would be arrested for it.

Indeed, credibility in this case impacts most of the above-cited factors, namely custodial status, whether police used duress or coercive tactics, whether Ms. Blackwell knew that she could [effectively] refuse consent, and the level and extent of her cooperation.

Trial Court Opinion, 4/20/18, at 7.

The trial court found Sergeant Young's testimony more credible than Blackwell's. It explained that although Sergeant Young's testimony contained several inconsistencies, overall, it found her "forthright and very detailed in her description [of events]" and that the inconsistencies were minor. ***Id***. at 8 (citing N.T. 12/22/15, at 47-48). At the suppression hearing, the court further reasoned that:

Ms. Blackwell had, I think, a lapse in her credibility in terms of who she thought was threatening her and why she signed the consent. It would be well within Ms. Blackwell's bias, even though [Dixon] is no longer her boyfriend. . ., to disavow the reasons why or create other reasons why she signed the consent. Clearly, she's now aware of the ramifications of signing the consent and that would give her reason to be biased.

When I weigh the credibility of both witnesses, I don't find that Sergeant Young has a reason to fabricate her testimony. I do find that Ms. Blackwell would've had a reason to be less than forthcoming as to the reasons underlying her signing that consent. For those reasons, I find that Sergeant Young was credible, that Ms. Blackwell signed the consent willingly; she was not under any undue coercion when she did so.

*Id*.

Because all credibility determinations are made by the finder of fact, we will not substitute our judgment for that of the trial court where, as in this case, there is evidence that supports the determination that Blackwell's consent was valid. *See Commonwealth v. Bell*, 871 A.2d 267, 274 (Pa. Super. 2005). Thus, we are bound by the trial court's determination of Sergeant Young's credibility.

The trial court's factual findings are supported by the record. Therefore, we hold that the court did not err in concluding the police did not have Blackwell in custody, and that Blackwell voluntarily consented to the police searching her apartment. As such, we affirm Dixon's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/19