J. S23045/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| LAURANCE ANTHONY BROWN, | : | No. 3435 EDA 2018 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered February 1, 2018,
in the Court of Common Pleas of Montgomery County
Criminal Division at No. CP-46-CR-0004086-2016

BEFORE:  NICHOLS, J., McCAFFERY, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        Filed: September 10, 2020

Laurance Anthony Brown appeals from the February 1, 2018 aggregate judgment of sentence of two and one-half to five years' imprisonment imposed after he was found guilty in a bench trial of two counts of possession of a firearm with altered manufacturer's number, and one count each of criminal use of communication facility ("CUCF"), possession with intent to distribute a controlled substance ("PWID"), possession of a controlled substance, and possession of drug paraphernalia.[1]   After careful review, we affirm the judgment of sentence.

The lengthy factual history of this case was set forth by the trial court in its June 25, 2019 opinion and we need not reiterate it here.  (**See** trial court

---

[1] 18 Pa.C.S.A. §§ 6110.2(a), 7512(a), and 35 P.S. § 780-113(a)(30), (a)(16), and (a)(32), respectively.

opinion, 6/25/19 at 1-11.) Appellant was charged with a litany of firearm and drug-related offenses following the February 2016 search of his person, vehicle, and residence by members of the Lower Merion Township Police Department. On November 10, 2016, appellant filed an **omnibus** pre-trial motion to suppress all the physical evidence seized as a result of these searches. An evidentiary hearing was held on appellant's suppression motion on July 24 and 25, 2017. On September 21, 2017, the suppression court denied appellant's suppression motion by issuing findings of fact and conclusions of law on the record. Thereafter, appellant waived his right to a jury and proceeded to a stipulated bench trial on December 6, 2017. As noted, the trial court found appellant guilty of two counts of possession of a firearm with altered manufacturer's number, and one count each of CUCF, PWID, possession of a controlled substance, and possession of drug paraphernalia. On February 1, 2018, the trial court sentenced appellant to two and one-half to five years' imprisonment. Appellant filed a post-sentence motion for reconsideration of sentence that was denied by the trial court on March 13, 2018. Following the reinstatement of his direct appeal rights **nunc pro tunc**, this timely appeal followed on November 21, 2018.[2]

---

[2] On November 26, 2018, the trial court ordered appellant to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b). Appellant filed a timely, albeit lengthy, Rule 1925(b) statement on November 30, 2018. On June 25, 2019, the trial court filed its Rule 1925(a) opinion.

Appellant raises the following eight claims of suppression court error for our review:

1. Did the suppression court err in holding that the Commonwealth presented sufficient evidence that [a]ppellant was not subject to an unlawful custodial detention lacking probable cause when he was interrogated and marijuana, keys, a cellphone, and a wallet were removed from his person?

2. Did the suppression court err in holding that the Commonwealth presented sufficient evidence that [a]ppellant was not subject to an unlawful investigative detention lacking reasonable suspicion when he was interrogated and marijuana, keys, a cellphone, and a wallet were removed from his person?

3. Did the suppression court err in holding that the Commonwealth presented sufficient evidence that [a]ppellant gave valid consent prior to the search of his vehicle when he was unduly coerced by the circumstances of the encounter?

[4]. Likewise, did the suppression court err in holding that the Commonwealth presented sufficient evidence that [a]ppellant gave valid consent prior to the search of his home when he was unduly coerced by the circumstances of the encounter?

[5]. Did the suppression court err in holding that the Commonwealth presented sufficient evidence that [a]ppellant's consent to search extended to items that were recovered from inside a locked box inside of his vehicle?

[6]. Did the suppression court err in denying the motion to suppress all evidence seized from Philadelphia County where law enforcement officers violated the Municipal Police Jurisdiction Act [("MPJA"), 42 Pa.C.S.A. § 8953]?

[7]. Did the suppression court err in denying the motion to suppress statements made regarding [a]ppellant's cell phone password and any evidence located within the cell phone after an unlawful search of the phone while transporting [a]ppellant to Philadelphia[?]

[8]. Did the suppression court err in denying the motion to suppress statements to law enforcement during the course of the encounter as involuntary?

Appellant's brief at 5-6.[3]

Our standard of review when addressing a challenge to a denial of a suppression motion is well settled.

> [Our] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones*, 121 A.3d 524, 526 (Pa.Super. 2015) (citation omitted; brackets in original), *appeal denied*, 135 A.3d 584 (Pa. 2016).

---

[3] For the ease of our discussion, we have elected to renumber some of appellant's issues.

Following a thorough review of the record, including the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that appellant's claims warrant no relief. The trial court authored a comprehensive, 34-page opinion wherein it thoroughly discussed all of the alleged errors of the suppression court. We find that the trial court's conclusions are supported by competent evidence and are clearly free of legal error. Specifically, we agree with the trial court that the police had reasonable suspicion, based on the totality of the circumstances, to believe that appellant was the person from whom the confidential informant arranged to purchase marijuana, sufficient to conduct an investigative detention. (**See** trial court opinion, 6/25/19 at 19-20; Issue 2, **infra**.) Additionally, we agree with the trial court that the police had probable cause to arrest appellant after he informed them during the course of their investigation that he had marijuana on his person. (**Id.** at 20-21; Issue 1, **infra**.) We also agree with the trial court that there is no arguable merit to appellant's myriad of reasons that his consent to search his vehicle and home was not voluntary. (**Id.** at 21-24; Issues 3-5, **infra**.) Likewise, the record supports the trial court's conclusion that appellant "erroneously alleged that [his] mother gave consent for the search of the basement[,]" when, in fact, it was appellant's grandmother, the homeowner, who consented to the search. (**Id.** at 25; Issues 3-5, **infra**.) Next, we agree with the trial court that the MPJA did not apply to the search of appellant's residence because law enforcement's actions in this matter fell

outside the scope of the MPJA. (***Id.*** at 25-28; Issue 6, ***infra*.**)[4]  We further

agree that the suppression court did not err in denying appellant's motion to

_____

[4] We agree with the trial court that ***Commonwealth v. O'Shea***, 567 A.2d 1023 (Pa. 1989), ***cert. denied***, 498 U.S. 881 (1990), is instructive:

> In ***O'Shea***, the court stated
>
>> we do not believe section 8953 prohibits police officers from leaving their primary jurisdiction to go into other jurisdictions to ask questions therein, or to enter a residence therein upon the consent of its owners (and full disclosure of the officers' purpose) and observe what they observe therein.  Such unobtrusive police conduct is outside the scope of section 8953, and is not illegal.  Any citizen of the Commonwealth could do what Detectives Freeman and Hediger did herein, namely drive to the O'Shea residence, ask them questions, enter their home with their consent and look around.  In the absence of explicit legislative directives to the contrary, we will not prohibit police officers from doing that which a private citizen could do.
>>
>> Accordingly, the initial search of the O'Shea residence and seizure of the items viewed in plain sight therein was not illegal under section 8953, nor under the constitutions of this state or of the United States.  That warrantless search was reasonable and justified by the freely given and informed consent of the owners of the residence, James and Marion O'Shea, who obviously had authority to show the detectives their gameroom-basement area.

Trial court opinion, 6/25/19 at 27-28, quoting ***O'Shea***, 567 A.2d at 1029-1030.

suppress various statements he voluntarily gave to police at the station. (*Id.* at 28-32; Issue 8, *infra*.) As recognized by the trial court, appellant's statements were gratuitously offered while he was not under custodial interrogation, or made following a valid waiver of his right to remain silent. (*Id.*) Lastly, we agree with the trial court's conclusion that appellant's phone was properly searched pursuant to a valid search warrant supported by sufficient probable cause. (*Id.* at 32-33, Issue 7, *infra*.)

Based on the foregoing, we discern no error on the part of the suppression court in denying appellant's motion to suppress. Accordingly, we adopt the trial court's comprehensive June 25, 2019 opinion as our own for purposes of appellate review of appellant's claims.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/20

OPINION

Filed 6/27/2019 11:07:00 AM Superior Court Eastern District
3435 EDA 2018

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY**
**PENNSYLVANIA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** : | | **NO. 4086-16** |
| **V.** : | | **3435 EDA 2018** |
| **LAURANCE BROWN** : | | |

**OPINION**

O'Neill, J.                                                                June 25, 2019

The Defendant, Laurance Brown, appeals from the judgment of sentence entered on February 1, 2018, as made final by the denial of his post-sentence motion on March 13, 2018. For the reasons set forth below, the judgment of sentence should be affirmed.

## I.     Facts and Procedural History

Detective Cameron Parker testified that early in the month of February 2016, a confidential informant approached him and offered to set up a purchase of marijuana. N.T. Jul. 25, 2017 at 11; N.T. Sept. 21, 2017 at 7. On February 10, 2016, the informant texted Detective Parker and indicted that they had arranged a deal with "L.B.," for a quarter pound of marijuana. Id. The transaction was arranged for February 11, 2016 between 11 a.m. and 2 p.m. at the Haverford Gable Apartments, in Haverford, Montgomery County located at 312 W. Montgomery Avenue. N.T. Jul. 25, 2017 at 12; N.T. Sept. 21, 2017 at 7. The informant could only describe the seller as a black male in his 20s who went by "L.B." N.T. Jul. 25, 2017 at 12; N.T. Sept. 21, 2017 at 3.

On the morning of February 11, 2016, Detective Parker directed several law enforcement officers to establish surveillance in the area near the Haverford Gables Apartments. N.T. Sept. 21, 2017 at 4. Detective Walter Kerr and his team were in the parking lot of the adjacent Haverford House Apartments located at 302 W. Montgomery Avenue. Id. Detective Kerr and his team had a full view of Haverford Gables. N.T. Jul. 24, 2017 at 13; N.T. Sept. 21, 2017 at 4. Detective Parker stayed with the informant in the vestibule of the Haverford Gables Apartments. Id. During the operation, the informant and L.B. were in continuous communication via text message, which Detective Parker observed. N.T. Jul. 24, 2017 at 14; N.T. Sept. 21, 2017 at 7. L.B. told the informant when he arrived at the location. Id. Detective Parker relayed that information to the surveillance officers. Id.

At approximately 1:30 p.m., Detective Parker radioed to the surveillance team that L.B. texted the confidential informant that he was arriving and was in the parking lot. N.T. Jul. 24, 2017 at 13; N.T. Sept. 21, 2017 at 7. The surveillance team observed a dark Chrysler 300 pull into the parking lot of the Haverford House Apartments. N.T. Jul. 24, 2017 at 14, 28; N.T. Sept. 21, 2017 at 4. The driver was the only passenger in the car. N.T. Jul. 24, 2017 at 14. The driver exited the car and began to walk around the parking lot as if he were looking for someone. Id. He fit the description of the seller-a young black male in his 20s. N.T. Jul. 24, 2017 at 14-15; N.T. Sept. 21, 2017 at 4. Detective Kerr identified Laurance Brown as the driver. N.T. Jul. 24, 2017 at

2

14. The driver of the car began to walk toward the location arranged by the confidential informant. N.T. Jul. 24, 2017 at 15; N.T. Sept. 21, 2017 at 4.

At this point, Detective Kerr, Officer Turek, Officer Larosa and a second detective on surveillance decided to approach the Defendant. N.T. Jul. 24, 2017 at 15; N.T. Sept. 21, 2017 at 4. Officer Turek was in full uniform; Detective Kerr wore a jacket identifying him as police. N.T. Jul. 24, 2017 at 17; N.T. Sept. 21, 2017 at 5. As they approached the Defendant, Detective Kerr had his gun drawn, pointing down at the side of his leg. N.T. Jul. 24, 2017 at 17. Officer Turek was wearing an AR-15 rifle in a sling across the front of his body. N.T. Jul. 24, 2017 at 17; N.T. Sept. 21, 2017 at 5. Neither Kerr nor Turek pointed their weapons at the Defendant. N.T. Jul. 24, 2017 at 17; N.T. Sept. 21, 2017 at 5. The other officers checked the car for additional occupants. N.T. Jul. 24, 2017 at 17.

Officer Turek asked the Defendant if he was L.B., to which the Defendant responded, "yes." N.T. Jul. 24, 2017 at 17; N.T. Sept. 21, 2017 at 5. Detective Kerr explained that they were detectives and asked the Defendant if he had anything on him that he should not have. N.T. Jul. 24, 2017 at 18; N.T. Sept. 21, 2017 at 5. The Defendant indicated that he had an ounce of marijuana in his coat pocket. Id. For officer safety, Kerr continued to ask the Defendant if he had any weapons or anything that could harm officers on his person. Id. Detective Kerr explained to the Defendant what was going to happen, reached into his pocket and removed the marijuana. N.T. Jul. 24, 2017 at 19; N.T. Sept. 21, 2017 at 5. Detective Kerr also removed the Defendant's keys, cell

3

phone and wallet from his pockets. N.T. Jul. 24, 2017 at 34; N.T. Sept. 21, 2017 at 5.

Detective Kerr took the Defendant to the car that they had been in during the surveillance and asked him to wait in the backseat to await Detective Parker's arrival.[1] N.T. Jul. 24, 2017 at 19; N.T. Sept. 21, 2017 at 5. Detective Kerr got into the backseat with the Defendant and continued to speak to him. N.T. Jul. 24, 2017 at 19. He asked him basic demographic questions and did not question him about the case. N.T. Jul. 24, 2017 at 39; N.T. Sept. 21, 2017 at 6. The Defendant was never handcuffed during this interaction; the car doors were not locked and the Tahoe was not a police vehicle. N.T. Jul. 24, 2017 at 19, 34; N.T. Sept. 21, 2017 at 5. However, Detective Kerr testified that the Defendant was detained at that point. N.T. Jul. 24, 2017 at 35; N.T. Sept. 21, 2017 at 6. None of the law enforcement officers present during this part of the investigation ever raised their voices or threatened the Defendant. N.T. Jul. 24, 2017 at 21.

Detective Parker arrived at the scene; he was dressed in casual clothing with a police jacket. N.T. Jul. 24, 2017 at 20; N.T. Sept. 21, 2017 at 5. Detective Parker never drew his gun or pointed a gun at the Defendant. Id. Detective Parker got into the car with the Defendant and introduced himself and explained they were investigating drug activity in the area. N.T. Jul. 25,

---

[1]Detective Parker removed the informant from the location and ultimately went to the location where Detective Kerr's team had detained the Defendant. N.T. Jul 25, 2017 at 14; N.T. Sept. 21, 2017 at 7.

4

2017 at 15; N.T. Sept. 21, 2017 at 8. The Defendant was not handcuffed. Id. There were no marked vehicles in the area and no vehicles activated their lights and sirens. N.T. Jul. 25, 2017 at 16; N.T. Sept. 21, 2017 at 8. Detective Parker asked the Defendant about the marijuana that Detective Kerr recovered from his person. Id. Detective Parker asked the Defendant for permission to search his car because the amount of marijuana recovered from the Defendant was substantially less than the amount the informant arranged to purchase. N.T. Jul. 25, 2017 at 16, 18; N.T. Sept. 21, 2017 at 8. The Defendant consented to the search of his car and executed a consent to search from. N.T. Jul. 25, 2017 at 18; N.T. Sept. 21, 2017 at 8. Detective Parker explained to the Defendant that he had the right to refuse the search. Id. The Defendant asked Detective Parker what would happen if he refused, Parker told him they would decide whether to impound the car and apply for a search warrant. Id. The Defendant consented and signed the consent to search form. Id.; Exhibit CS-1. At the time he consented to the search, he was not under the influence of any intoxicants or mental illness or distress. N.T. Jul. 25, 2017 at 19; N.T. Sept. 21, 2017 at 8. Detective Parker testified that in his training and experience, the Defendant voluntarily consented to the search of his car. Id. Throughout their interaction, Detective Parker maintained a conversational tone of voice and did not raise his voice or make any threats or promises to obtain consent. N.T. Jul. 25, 2017 at 20. Officers searched the Defendant's car and recovered four sealed bags of marijuana from a locked box in the trunk

5

that the Defendant's keys were used to open. N.T. Jul. 21, 2017 at 21; N.T. Sept. 21, 2017 at 9.

Knowing that drug traffickers typically have a base of operations, Detective Parker asked the Defendant if there were any additional drugs or anything related to his sale of marijuana in his home. N.T. Jul. 25, 2017 at 21-22; N.T. Sept. 21, 2017 at 9. Prior to inquiring about any additional drugs in his home, Detective Parker verbally advised the Defendant of his Miranda[2] rights. N.T. Jul. 25, 2017 at 22; N.T. Sept. 21, 2017 at 9. At that point, the Defendant indicated that he had some marijuana and packaging materials in his home. N.T. Jul. 25, 2017 at 23; N.T. Sept. 21, 2017 at 9. Detective Parker asked the Defendant if he could accompany him to the home to retrieve the items. Id. Detective Parker told the Defendant that they would only retrieve the items; the Defendant lived with his mother and grandmother in a home owned by his grandmother. Id. Detective Parker did not make any threats or promises to induce the Defendant to take them to his home in Philadelphia. N.T. Jul. 25, 2017 at 24; N.T. Sept. 21, 2017 at 9. At the time the Defendant consented to accompany Detective Parker to his home, Detective Parker added the Defendant's bedroom in the home to the consent to search form. N.T. Jul. 25, 2017 at 25; N.T. Sept. 21, 2017 at 10. Detective Parker did not have the Defendant sign the form or initial after this addition. Id. After the Defendant consented to a search of his bedroom, Detective Parker and the Defendant got into the back of an unmarked detective's car. N.T. Jul. 25, 2017 at 26; N.T.

---

[2]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

6

Sept. 21, 2017 at 10. The Defendant walked himself to the unmarked car and was not handcuffed during that walk or during the drive to Philadelphia. Id. Detective Parker sat in the back seat with him. Id. The car was an unmarked sedan that did not have a cage and the doors were not locked. N.T. Jul. 25, 2017 at 85.

During the drive, Detective Parker initially agreed that the Defendant could call the home to let his mother know they were on their way. N.T. Jul. 25, 2017 at 27; N.T. Sept. 21, 2017 at 10. The Defendant provided Detective Parker with the passcode to unlock his phone. Id. While Detective Parker did unlock the phone before deciding against the call, he did not look at any of the phone's contents. N.T. Jul. 25, 2017 at 28; N.T. Sept. 21, 2017 at 10. They arrived at the home approximately ten minutes later. Id.

Upon arriving at the home, Detective Parker spoke with the Defendant's mother at the front door and told her that they were there to retrieve drug related items with the Defendant's permission. N.T. Jul. 25, 2017 at 28-29; N.T. Sept. 21, 2017 at 10. The Defendant's mother invited them in to the home. N.T. Jul. 25, 2017 at 30; N.T. Sept. 21, 2017 at 10. They did not search the first floor. N.T. Sept. 21, 2017 at 10. The Defendant was present and was not handcuffed. N.T. Jul. 25, 2017 at 30; N.T. Sept. 21, 2017 at 10.

Detective Parker further explained to the Defendant's mother that the Defendant told them there was additional marijuana and some paraphernalia in his bedroom that they sought to retrieve; he told her they did not intend to search her whole house. N.T. Jul. 25, 2017 at 32; N.T. Sept. 21, 2017 at 11.

7

The Defendant led Parker to a second floor bedroom. N.T. Jul. 25, 2017 at 33; N.T. Sept. 21, 2017 at 11. The Defendant went in and moved a few things around in the room; Defendant manipulated items while Parker observed. Id. The Defendant could not find anything in his room; he indicated maybe it was in the study downstairs. Id. The Defendant was leading Detective Parker around the house, the other officers remained on the first floor. Id. There was nothing in study, the Defendant opined that perhaps his brother had taken it. Id. At this point, Parker asked what was going on and told the Defendant to stop playing games. N.T. Jul. 25, 2017 at 34; N.T. Sept. 21, 2017 at 11. The Defendant swore that the items had been in his bedroom but now they were gone. Id.

As Detective Parker was preparing to leave the home and return to the police station, he asked the Defendant's grandmother, the homeowner, if the home had a basement. N.T. Jul. 25, 2017 at 35; N.T. Sept. 21, 2017 at 11. She said that it did and Detective Parker asked her if they could check to make sure there was nothing illegal in the basement. Id. She consented; there was no evidence that she was under influence or in mental distress. Id. The Defendant was present at this time and did not say anything when she consented to the search of the basement. N.T. Jul. 25, 2017 at 36; N.T.Sept. 21, 2017 at 11. Two officers went down to the basement, Detective Parker remained on the first floor with the Defendant's mother and grandmother. N.T. Jul. 25, 2017 at 35; N.T. Sept. 21, 2017 at 12. One of the officers returned and asked Detective Parker to come to the basement. Id.

8

Detective Parker went down to the basement where he found a section of the basement that was set up like a bedroom. N.T. Jul. 25, 2017 at 36; N.T. Sept. 21, 2017 at 12. From where he was standing, Detective Parker could see additional marijuana packaging material in plain view. N.T. Jul. 25, 2017 at 37; N.T. Sept. 21, 2017 at 12. Detective Parker returned the first floor of the home where the Defendant's grandmother confirmed that the Defendant sometimes used the basement as his bedroom. Id. Detective Parker then asked the Defendant if that was his bedroom; the Defendant confirmed that he sometimes stayed down there. Id.

Detective Parker asked the Defendant for consent to search the basement. Id. He told the Defendant and his family that they could refuse and that if they refused Detective Parker would stay as long as it took for Philadelphia or the State Police to get a warrant. Id. The Defendant's grandmother indicated that she wanted the things out of the house. N.T. Jul. 25, 2017 at 37; N.T. Sept. 21, 2017 at 12. At that point, the Defendant consented to a search of the basement. Id. Detective Parker added the basement to consent form. N.T. Jul. 25, 2017 at 38; N.T. Sept. 21, 2017 at 12. The Defendant signed and initialed the form before the search. Id. Detective Parker's tone remained conversational and he did not make any threats to obtain consent; the Defendant was never handcuffed. Id.

After obtaining consent to search the basement, Detective Parker, Officer Garner and the Defendant went into the basement. N.T. Jul. 25, 2017 at 40; N.T. Sept. 21, 2017 at 13. A search of the area uncovered, approximately 70

9

plastic jars containing 1/2-1 gram of marijuana, unopened cases of bottles, packaging, 2 guns, vacusealed bags of marijuana labeled by strain, and currency. Id. The items were collected and taken into evidence. N.T. Jul. 25, 2017 at 45; N.T. Sept. 21, 2017 at 13. Detective Parker and the other officers returned to the police station with the Defendant. Id.

While law enforcement was inside the home, the Defendant's phone remained in the unmarked vehicle in which he was driven to the home. N.T. Jul. 25, 2017 at 39. No one accessed the phone or got it out of the car. Id. This Court found, specifically, that there was no search of the Defendant's phone. N.T. Sept. 21, 2017 at 21.

Once they returned to the station, Detective Parker readvised the Defendant of his Miranda rights and had him sign a Constitutional rights form. N.T. Jul. 25, 2017 at 46; Exhibit CS-9; N.T. Sept. 21, 2017 at 13. After reviewing the form with the Defendant, Detective Parker instructed the Defendant to read a sentence out loud to ensure that he was following along and understood the form. N.T. Jul. 25, 2017 at 47-48. The Defendant initialed the sentence that he read aloud. N.T. Jul. 25, 2017 at 48. He indicated "yes" on the form when asked if he understood his constitutional rights. Id. He also wrote "yes" when asked if he was still willing to speak to law enforcement and to give a voluntary statement. N.T. Jul. 25, 2017 at 48; N.T. Sept. 21, 2017 at 13.

The statement began at 4:20 p.m. and concluded at 5:08 p.m. Exhibit CS-10. The interview took place in a room next to the booking room at the

10

Lower Merion Police station. N.T. Jul. 25, 2017 at 54; N.T. Sept. 21, 2017 at 13. The door was closed to allow for privacy. Id. Detective Parker's tone remained conversational throughout his entire interaction with the Defendant. N.T. Jul. 25, 2017 at 55; N.T. Sept. 21, 2017 at 14.

The Defendant was not confrontational or argumentative. N.T. Jul. 25, 2017 at 54; N.T. Sept. 21, 2017 at 14. He was not happy to be at the police station, but he never refused to answer any questions. N.T. Jul. 25, 2017 at 55; N.T. Sept. 21, 2017 at 14. The Defendant chose to give a statement to police about the drugs and guns recovered. Id. He never indicated that the wanted to stop talking to police. Id. He never asked for an attorney. Id. The Defendant was awake and alert during his statement. N.T. Jul. 25, 2017 at 55-56; N.T. Sept. 21, 2017 at 14. The Defendant appeared to understand what he was doing. Id. The Defendant initialed next to most, if not all, of the questions on his written statement and signed the bottom of each page. N.T. Jul. 25, 2017 at 56.

On March 22, 2017, Detective Parker applied for a search warrant for the Defendant's cell phone. N.T. Jul. 25, 2017 at 62; N.T. Sept. 21, 2017 at 14. At the time of Defendant's arrest on February 11, 2016, the Defendant's phone was taken in to police custody where it remained. N.T. Jul. 25, 2017 at 65; N.T. Sept. 21, 2017 at 14. At the time of the search warrant, Detective Parker believed the contents of the phone would still be in existence as the device was placed in airplane mode. Id. In airplane mode, the phone cannot be accessed remotely. Id.

11

The Defendant and his mother both testified at the Suppression Hearing. They presented a version of events that this Court did not find credible. N.T. Sept. 21, 2017 15-18, 20.

The Defendant was charged with seven firearm and drug related charges. Following a suppression hearing on July 24 and 25, 2017, this Court denied the Defendant's Motion to Suppress by issuing findings of fact and conclusions of law on the record on September 21, 2017. Thereafter, the Defendant proceeded to a stipulated bench trial on December 6, 2017 and was convicted of two counts of Possession of a Firearm with Altered Manufacturer's Number,[3] one count of Criminal use of a Communication Facility,[4] one count of Possession with the Intent to Deliver,[5] one count of Possession of a Controlled Substance[6] and one count of Possession of Drug Paraphernalia.[7] On February 1, 2018 he was sentenced to two and one half to five years' incarceration in a State Correctional Institution. The Defendant filed a post sentence motion on March 1, 2018. This Court denied the Motion on March 13, 2018. The Defendant filed a timely notice of appeal on March 22, 2018. However, counsel failed to file a docketing statement and the appeal was dismissed.

On September 5, 2018, the Defendant filed a PCRA seeking reinstatement of his direct appeal *nunc pro tunc*, which this Court granted by order of October 24, 2018. On November 21, 2018, Defendant filed a notice of

---

[3] 18 Pa. C.S.A. § 6110.2 (a).
[4] 18 Pa. C.S.A. § 7512 (a).
[5] 35 Pa. C.S.A. § 780-113 (a)(30).
[6] 35 Pa. C.S.A. § 780-113 (a)(16).
[7] 35 Pa. C.S.A. § 780-113(a)(32).

12

appeal. By Order of November 26, 2018, this Court directed the Defendant to file a Concise Statement of Errors Complained of on Appeal. He has since complied with that directive.

## II.   Issues

The Defendant raises the following issues, reproduced verbatim:

1. The Defendant must be awarded a new trial as the trial court erred in denying Mr. Brown's motion to suppress physical evidence and statements based on a lack of probable cause and reasonable suspicion to be stopped by the police under the 4th and 14th Amendments of the United States and Pennsylvania Constitutions.

   a. The Defendant's encounter with police at Haverford House Apartments was so coercive as to be the functional equivalent of an arrest, and therefore the Defendant was subject to a custodial detention that required police to possess probable cause. Police that stopped Mr. Brown did not possess the requisite belief that more likely than not the Defendant committed a crime at the point the Defendant was approached by five officers, with guns drawn, surrounded by multiple unmarked police vehicles, placed into handcuffs, physically searched and his belongings removed from his person, and instructed to sit inside a police vehicle where he was not free to go.

   b. In the alternative, the Defendant's encounter with police at Haverford House Apartments was an investigatory detention that required police to possess reasonable suspicion. Police that stopped Mr. Brown did not possess the requisite belief that criminal activity was afoot at the point he was approached by five officers, with guns drawn, surrounded by multiple unmarked police vehicles, placed into handcuffs, physically searched and his belongings removed from his person, and sat inside a police vehicle where he was not free to go.

13

c. Police lacked reasonable suspicion and probable cause to stop the Defendant. The sole basis for the stop was vague identifying information that was not corroborated at the time that the police conducted the stop. Further, the reliance solely on a confidential informant, when the information from the confidential information does not match law enforcement's observations, is insufficient for reasonable suspicion or probable cause.

d. All physical evidence and statements acquired after the initial illegal stop must be suppressed as fruits of the poisonous tree.

2. The Defendant must be awarded a new trial as the trial court erred in denying Mr. Brown's motion to suppress physical evidence recovered from his person based on lack of reasonable suspicion and probable cause.

   a. Police lacked reasonable suspicion and probable cause to search the Defendant's person and recover narcotics. There was no evidence that the search was conducted in accordance with the Terry v. Ohio standards nor was there sufficient probable cause at the time of the search to believe the Defendant had narcotics on his person.

   b. Police lacked reasonable suspicion and probable cause to search the Defendant's person and recover keys, wallet and a cell phone. At the time of the search there was no basis to support these items being removed pursuant to Terry v. Ohio nor was there sufficient probable cause at the time of the search to believe that the items were connected to criminal activity.

3. The Defendant must be awarded a new trial as the trial court erred in denying Mr. Brown's motion to suppress physical evidence recovered in his vehicle based on invalid consent.

   a. Mr. Brown's consent to search was invalid as the consent was acquired as a result of coercion and duress. See Commonwealth v. Acosta, 815 A.2d 1078 (Pa. Super. 2003). Mr. Brown's consent to search did not include

14

locked items inside of his vehicle. See Commonwealth v. Randolph, 151 A.3d 170 (Pa. Super. 2016).

4. The Defendant must be awarded a new trial as the trial court erred in denying Mr. Brown's motion to suppress physical evidence recovered in his home.

   a. The police flagrantly violated the MPJA when they searched and recovered items in the Defendant's home. Commonwealth v. Fiume, 292 Pa. Super. 54 (1981). A flagrant violation of the MPJA, made not during hot pursuit or to effectuate an arrest, necessitates the suppression of all physical evidence and statements obtained after the illegal police activity outside of the appropriate jurisdiction.

   b. Police did not obtain valid consent to search any part of the home, particularly the Defendant's bedroom/basement. Mr. Brown's consent to search the bedroom/basement was invalid as the consent was acquired as a result of coercion or duress. Further, Mr. Brown's consent to search the basement was invalidly requested after police had already searched the area. Finally, any items recovered in the Defendant's home must be suppressed as police unconstitutionally accessed and searched, without a warrant or consent, the Defendant's phone in order to obtain information directing law enforcement to contraband in the basement of the Defendant's home.

   c. Nor could did [sic] the Defendant's mother provide a valid consent. Ms. Laurie Lindsey's consent to search was invalid as she did not have the authority to grant permission to search the Defendant's bedroom/basement. Ms. Laurie Lindsey's consent to search was invalid as the consent was acquired as a result of coercion and duress.

5. The Defendant must be awarded a new trial as the trial court erred in denying Mr. Brown's motion to suppress physical statements regarding his possession of narcotics, guns and his phone passcode

15

a. If the Court believes the Defendant made an admission to possessing marijuana on his person during the initial stop at Haverford House Apartments in response to an alleged question about whether he had any dangerous items on his person, that statement must be suppressed due to lack of Miranda warnings, as the questioning done by Detective Kerr was designed to elicit an incriminating response and the Defendant was the subject of custodial interrogation.

b. If the Court believes that the Defendant made Statements to Detective Parker, before, during, and after the vehicle search and before, during, and after the search of Mr. Brown's home, those statements must be suppressed. The statements made by the Defendant regarding any items kept at his Philadelphia home must be suppressed due to lack of Miranda warnings, as there is no evidence that Miranda was given and understood by the Defendant at that time. The statements made by the Defendant identifying what rooms and property were his must be suppressed due to lack of Miranda warnings, as there is no evidence that Miranda was given and understood by the Defendant at that time. Finally, the passcode provided by the Defendant for his cell phone was illegally obtained and must be suppressed since it was obtained without Miranda warnings. To the extent that his cellphone was later searched using that passcode, any evidence on his phone or any evidence recovered based on the content of his phone must be suppressed. To the extent that law enforcement was able to put the device in "airplane mode" pending search warrant, preventing other persons from remotely accessing the phone, the contents of the phone must be suppressed.

c. The Defendant's statements made to Detective Parker at the police station must be suppressed. The Defendant's statement was made after an illegal search and arrest and must be suppressed. Additionally, the Defendant's statement was made after unknowing and involuntary Miranda warnings and therefore must be suppressed.

16

6. The Defendant must be awarded a new trial as the trial court erred in denying the Defendant's motion to suppress the physical evidence recovered from an invalid search of the Defendant's cell phone.

    a. The Defendant's passcode was unlawfully obtained without Miranda warnings and then used to manipulate his phone prior to the application and approval of a search warrant. The search warrant for the contents of the phone was facially insufficient for a showing of probable cause and the information contained within the search warrant was stale.

## III. Discussion

The Court notes preliminarily that pursuant to Pa. R. A. P. 1925 (b)(4)(ii), a Statement of Errors Complained of on Appeal shall "shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." (emphasis added). Likewise, "[t]he Statement should not be redundant or provide lengthy explanations as to any error." 1925 (b)(iv).

Initially, the Court notes that at the outset of the hearing on his suppression motion the Defendant indicated that he sought to challenge: "the initial stop, the search of the vehicle, the search of the house on consent grounds, and the search of the house under violation of the MPJA." N.T. Jul. 25, 2017 at 6. Subsequently, during the hearing on the motion, he indicated that he also wished to challenge the four corners of the search warrant obtained for his cell phone. N.T. Jul. 25, 2017 at 59. While his concise statement is verbose and redundant and factually incorrect in many instances, it appears that the Defendant seeks to challenge the same on appeal.

17

Additionally, he has raised, for the first time on appeal, three issues, which this Court submits are waived. First, he challenges the purported search of his person which recovered his keys, wallet and cell phone (Concise Statement Issue 2 (b)); next, he appears to allege that the passcode to his phone was illegally obtained without <u>Miranda</u> warnings (Concise Statement Issue 5(b))[8]; finally, he makes an indecipherable claim relating to his phone being placed in "airplane mode" by police until they obtained a search warrant (Concise Statement 5(b)). None of these claims were made at the hearing on his written motion, thus constituting waiver. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa. R.A.P. 302(a). For the reasons set forth below, the remaining claims are without merit and must fail.

The standard of review for the denial of a suppression motion is well settled. The Pennsylvania Supreme Court has stated:

> [o]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual

---

[8] The Court made a specific finding that there was no search of the Defendant's phone conducted prior to the execution of the search warrant for the phone. N.T. Sept. 21, 2017 at 21. The only evidence adduced at the suppression hearing was that the Defendant requested to call his mother when en route to the home, Detective Parker asked for the passcode to unlock it to make the call and then changed his mind about making the call. Detective Parker did not search the phone and the phone remained in the car during the entire interaction at the Defendant's residence.

18

findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

Commonwealth v. Bomar, 826 A.2d 831, 842 (Pa. 2003) (citing Commonwealth v. Fletcher, 750 A.2d. 261 (Pa. 2007); Commonwealth v. Hall, 701 A.2d 109, 197 (Pa. 1997), cert. denied, 523 U.S. 1082 (1998)).

### 1. The initial stop and search of the Defendant was lawful. (Concise Statement Issues 1 and 2 (a))

The Defendant's first contention is that his initial encounter with police was not supported by reasonable suspicion or probable cause, thus, any evidence and statements obtained after the illegal stop must be suppressed. To the extent that the Defendant alleges that his person was searched without reasonable suspicion or probable cause, this claim was not raised before this Court, thus constituting waiver. The remaining claims are without merit and must fail.

It is well settled that there are three categories of police-citizen interactions.

> The first of these is a 'mere encounter' (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an 'investigative detention' must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or 'custodial detention' must be supported by probable cause.

Commonwealth v. Ranson, 103 A.3d 73, 76-77 (Pa. Super. 2014), reargument denied (Dec. 16, 2014), appeal denied, 117 A.3d 296 (Pa. 2015) (citations omitted). Furthermore,

19

[a] police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

Id. at 77. (citations omitted).

Instantly, while conducting surveillance as a part of a controlled buy operation, law enforcement received word that the intended target texted the confidential informant that he had arrived at the designated location. Law enforcement observed the Defendant to be the only person in the area, additionally, he matched the description of the dealer, identified by the confidential informant as "L.B." Police approached him initially to determine if he was, in fact, L.B. The Defendant answered affirmatively that he was L.B. At this point, police had adequate reasonable suspicion to believe that the Defendant was the person from whom the informant arranged to buy marijuana. Armed with that suspicion, police lawfully detained the Defendant to continue that investigation. During the course of that investigation, Detective Kerr asked the Defendant if he had anything on his person, to which the Defendant replied that there was an ounce of marijuana in his pocket. Detective Kerr retrieved the marijuana from his pocket and emptied his pockets. At that point, police had probable cause to arrest the Defendant for

20

possession of narcotics. Instead, they continued their investigation. Thus, based on the totality of the circumstances, the initial stop of the Defendant was supported by reasonable suspicion and the continued investigation was supported by probable cause and this claim must fail.

## 2. The Defendant's consent to search his and his home car was validly obtained. (Concise Statement Issue 3 and 4 (b) and (c)).

The Defendant makes multiple contentions related to the consensual searches of his car and home. First, he alleges that the consent to search his vehicle was coerced and did not include the locked box in his trunk. Next, he claims that his consent to search his home was coerced and his consent to search the basement was obtained after the area had already be searched.[9] Finally, he claims that his mother did not have the authority to consent to a search of the basement. He is mistaken.

Generally, a search without a warrant is constitutionally impermissible. However, there are exceptions to the warrant requirement, including a consensual search. Commonwealth v. Valdivia, 195 A.3d 855, 861 (Pa., 2018) To establish a valid consensual search "the prosecution must first prove that the consent was given during a legal police interaction, or if the consent was given during an illegal seizure, that it was not a result of the illegal seizure; and second, that the consent was given voluntarily." Commonwealth v. Reid, 811 A.2d 530, 544 (Pa. 2002) (citations omitted). Validity of consent based on

_____

[9] Additionally, he alleges that the basement was searched as a result of a search of his phone that this Court specifically found did not occur. N.T. Sept. 21, 2017 at 21.

21

totality of circumstances. Id. at 546 (citation omitted). "When an official search is properly authorized, the scope of the search is limited by the terms of its authorization. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent." Id. at 549 (citations omitted). The Pennsylvania Supreme Court has declined to adopt *per se* rule that consent in context of a lawful custodial detention is involuntary. Commonwealth v. Mack, 796 A.2d 967 (Pa. 2002). Statement by police that they would have to get a search warrant is a non-dispositive factor to consider in the totality of the circumstances to determine if consent was coerced. Id. "For a finding of voluntariness, the Commonwealth must establish that the consent given by the defendant "is the product of an essentially free and unconstrained choice – not the result of duress or coercion, express or implied, or a will overborne – under the totality of the circumstances." Valdivia, 195 A.3d at 862 (citations omitted).

First, the Defendant voluntarily consented to the search of his vehicle. As discussed above, law enforcement legally detained the Defendant prior to seeking his consent to search his vehicle. Thus, the issue turns on the voluntariness of his consent. At the time of the consent, Detective Parker had gotten into the back seat of an unmarked police Tahoe where the Defendant was seated. There were no other law enforcement officers in the vehicle. Detective Parker did not have a weapon drawn. There were no marked cars in the area, no police vehicles deployed their lights and sirens. The Defendant

22

was not handcuffed; he had been in the car for one to two minutes before Detective Parker arrived. The car was an unmarked detective car with no cage; the door could be opened from the inside and the door was not locked.

Detective Parker explained the investigation and asked him if he would consent to a search of his car since the amount of marijuana found on his person was much less than the confidential informant had arranged to buy. Detective Parker explained to the Defendant that he could refuse consent; the Defendant asked what would happen if he refused. Detective Parker explained that they would decide whether to impound the car and to apply for a search warrant. Detective Parker testified that he maintained a conversational tone throughout and made no threats or promises to induce the Defendant to consent. Detective Parker testified that in his opinion it appeared that the Defendant voluntarily consented to the search of the vehicle. The Defendant consented to the search of the vehicle and did not limit or revoke his consent at any time.

The Defendant signed a consent to search form that further advised him of his right to refuse to sign the form and indicated that no promises, threats, force or physical or mental coercion were used. Exhibit CS-1. Based on the totality of the circumstances, the Defendant voluntarily consented to the search of his car, including the locked box in the trunk, from which drugs were ultimately recovered. Thus, this claim is without merit and must fail.

Likewise, the Defendant gave a voluntary consent to search his home to recover the drugs and paraphernalia he told police were there. Before driving

23

to Philadelphia, the Defendant's bedroom was added to the consent to search form. While the Defendant did not sign or initial at that time, he had recently read and signed the same form when he consented to the car search. The form informed him of his right to refuse the search. The Defendant was aware that he could refuse, but agreed to accompany police to his home to remove the items he told them were in his possession.

When they arrived at the home, the Defendant's mother invited them in and Detective Parker explained to her that the Defendant had given permission to retrieve some items from his bedroom. At that point, the Defendant led Detective Parker upstairs and began to look around his room. He was unable to find the items he said were there. He then led Detective Parker to another room in the house, before stating that his brother must have taken the items.

After the initial search of his bedroom did not recover the items he said were there, law enforcement obtained consent from the homeowner and the Defendant to search the basement. The Defendant and his mother were both present and did not object. Upon learning that the Defendant used part of the room as a bedroom, this area was added to the consent to search form and he signed and dated the form. Again, the form explained that he had the right to refuse consent. No threats or promises were made to obtain consent to search the basement. The family was informed that law enforcement would obtain a warrant if they refused consent. There was no evidence that the Defendant or his grandmother were under the influence of any substances or mental or emotional disorders. Based on the totality of these circumstances, this Court

24

found that the consent to search the home was voluntary and this claim must fail.

Finally, the Defendant's concise statement erroneously alleges that the Defendant's mother gave consent for the search of the basement. This Court credited Detective Parker's testimony that the Defendant's grandmother, the homeowner, gave consent for the search along with the Defendant himself. Testimony adduced at the suppression hearing indicated that the Defendant's mother was present and did not object to the search. Therefore, this claim must fail.

### 3. The Municipal Police Jurisdiction Act did not apply to the search of the Defendant's home. (Concise Statement Issue 4 (a)).

The Defendant's final allegation of error relating to the search of his home is that it violated the Municipal Police Jurisdiction Act ("MPJA"). The Act provides,

(a) **General rule.**--Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

(1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to the requirements of the Pennsylvania Rules of Criminal Procedure, except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which regularly provides

25

primary police services in the municipality wherein the warrant is to be served.

(2) Where the officer is in hot pursuit of any person for any offense which was committed, or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense.

(3) Where the officer has been requested to aid or assist any local, State or Federal law enforcement officer or park police officer or otherwise has probable cause to believe that the other officer is in need of aid or assistance.

(4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

(5) Where the officer is on official business and views an offense, or has probable cause to believe that an offense has been committed, and makes a reasonable effort to identify himself as a police officer and which offense is a felony, misdemeanor, breach of the peace or other act which presents an immediate clear and present danger to persons or property.

(6) Where the officer views an offense which is a felony, or has probable cause to believe that an offense which is a felony has been committed, and makes a reasonable effort to identify himself as a police officer.

42 Pa.C.S.A. § 8953.

The Defendant alleged that Detective Parker's actions did not fall within any of the foregoing exceptions and thus the evidence seized from 5100 Woodbine Avenue in Philadelphia should be suppressed. He is mistaken.

26

Specifically, this Court found <u>Commonwealth v. O'Shea,</u> 567 A.2d 1023 (Pa. 1989)[10], to be instructive. In <u>O'Shea</u>, law enforcement travelled outside of their primary jurisdiction in the course of a murder investigation. <u>Id.</u> at 1025. Hoping to question the Defendant about a homicide and robbery that took place in Pittsburgh, City of Pittsburgh Detectives travelled to the Defendant's home in a neighboring jurisdiction. <u>Id.</u> The Defendant was not home at the time of their arrival, however, the homeowners granted consent for the Detectives to look around the home. <u>Id.</u> The homeowners, the defendant's brother and sister-in-law let Detectives to the area of the home where the defendant slept. <u>Id.</u> In plain view, there were several items identical to those stolen from the crime scene. <u>Id.</u> at 1025-26.

In <u>O'Shea</u>, the court stated

> we do not believe section 8953 prohibits police officers from leaving their primary jurisdiction to go into other jurisdictions to ask questions therein, or to enter a residence therein upon the consent of its owners (and full disclosure of the officers' purpose) and observe what they observe therein. Such unobtrusive police conduct is outside the scope of section 8953, and is not illegal. Any citizen of the Commonwealth could do what Detectives Freeman and Hediger did herein, namely drive to the O'Shea residence, ask them questions, enter their home with their consent and look around. In the absence of explicit legislative directives to the contrary, we will not prohibit police officers from doing that which a private citizen could do.

---

[10] This Court is aware of the Supreme Court's recent decision of <u>Commonwealth v. Hlublin,</u> ---A.3d. ---- (Pa. 2019) calling the continued viability of <u>O'Shea's</u> three part test for determining whether suppression is the appropriate remedy for a violation of Section 8953 into doubt. However, <u>O'Shea</u> has not been explicitly overruled as of this date and this Court found that there was no violation of the MPJA in the instant matter.

27

Accordingly, the initial search of the O'Shea residence and seizure of the items viewed in plain sight therein was not illegal under section 8953, nor under the constitutions of this state or of the United States. That warrantless search was reasonable and justified by the freely given and informed consent of the owners of the residence, James and Marion O'Shea, who obviously had authority to show the detectives their gameroom-basement area.

Id. at 1029-30.

Instantly, law enforcement did that which a private citizen could do when they traveled to the Defendant's home in a neighboring jurisdiction and entered the home with his consent and with that of his grandmother, the homeowner. Therefore, this Court found that their actions fell outside of the scope of the MPJA and this claim must fail.

### 4. The Court properly denied the Defendant's Motion to Suppress his statements. (Concise Statement Issue 5).

The Defendant's next contention is that his statements should have been suppressed. First, he contends that his statement to Detective Kerr about the marijuana in his pocket required Miranda warnings. Next, he contends that any statements regarding additional drugs or paraphernalia and their location in his home must be suppressed due to a lack of Miranda warnings. Finally, he contends his statement at the police station must be suppressed as a fruit of an illegal search and arrest and for "unknowing and involuntary Miranda warnings." He is mistaken.

In order to trigger the safeguards of Miranda, there must be both custody and interrogation. Commonwealth v. Heggins, 809 A.2d 908, 914 (Pa. Super. 2002) (citing Commonwealth v. Turner, 772 A.2d 970, 973 (Pa. Super.

28

2001) (en banc)). "The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the officers or the person being seized." Commonwealth v. Gwynn, 555 Pa. 86, 98, 723 A.2d 143, 148 (1998).

"The test for custodial interrogation is 'whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action of movement is restricted by such interrogation.'" Commonwealth v. Brown, 375 A.2d 1260, 1264 (Pa. 1977) (citations omitted). Thus, custodial interrogation does not require that the police make a formal arrest, nor that the police intend to make an arrest. Id. Rather, the test of custodial interrogation is whether the individual being interrogated reasonably believes his freedom of action is being restricted. Id. Statements not made in response to custodial interrogation are classified as gratuitous and are not subject to suppression for lack of Miranda warnings. Commonwealth v. Mannion, 725 A.2d 196, 200 (Pa. Super. 1999) (en banc) (citation omitted).

"The test for determining the voluntariness of a confession and the validity of the waiver of the right to remain silent is the totality of the attending circumstances." Commonwealth v. D'Amato, 526 A.2d 300, 305 (Pa. 1987) (citing Commonwealth v. Fahy, 516 A.2d 689, 695 (Pa. 1986); Commonwealth

29

v. Whitney, 512 A.2d 1152 (Pa. 1986)). In examining the totality of the circumstances surrounding a confession, the courts look to a myriad of factors including "the duration and methods of interrogation, the conditions of detention, the manifest attitude of the police toward the accused, the accused's physical and psychological state, and 'all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination.'" D'Amato, 526 A.2d at 305 (citing Commonwealth v. Crosby, 346 A.2d 768 (Pa. 1975)). Other relevant factors include:

> The accused's age; his level of education and intelligence; the extent of his previous experience with police; the repeated and prolonged nature of the questioning; the length of detention prior to the confession; whether he was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep, or medical attention; and whether he was physically abused or threatened with abuse.

Commonwealth v. Perez, 845 A.2d 779, 785 (Pa. 2004) (citing People v. Cipriano, 431 Mich. 315, 429 N.W.2d 781 (1988)). To be valid, a confession must be given free of any physical or psychological coercion which might interfere with one's will to resist. Commonwealth v. Cunningham, 370 A.2d 1172, 1175 (Pa. 1977) (citing Culombe v. Connecticut, 367 U.S. 568 (1961); Commonwealth v. Cockfield, 350 A.2d 833 (Pa. 1976)).

Initially, Detective Kerr and the surveillance team approached the Defendant and asked him for identification. Upon producing said identification, they had reasonable suspicion to believe that he was the dealer with whom the confidential informant arranged a drug deal. At that point, they detained him to continue their investigation. For officer safety, Detective Kerr

30

asked him if there was anything on his person that could harm the officers or anything that he should not have. The Defendant responded that there was marijuana in his pocket. There was no custodial interrogation at this point, and thus his statement regarding the marijuana in his pocket was gratuitous and not subject to suppression for lack of <u>Miranda</u> warnings.

As to his statements regarding additional drugs in his home, Detective Parker testified that the verbally gave the Defendant Miranda warnings prior to questioning him about items in his home. This Court credited Detective Parker's testimony in this regard. Throughout this interaction, Detective Parker's tone remained conversational. The Defendant continued to cooperate with the investigation and told Detective Parker what was in his home and where they could find it.

Finally, the Defendant's statement at the police station was voluntary and pursuant to a valid waiver of his right to remain silent. Throughout his entire interaction with police, the Defendant was cooperative. When they returned to the station following the seizure of the drugs and guns from his home, Detective Parker reviewed a written constitutional rights form with the Defendant. He testified that he had the Defendant read a sentence out loud to ensure that he could read and understand the document; the Defendant initialed the sentence he read aloud. The statement took place in a room off of the booking room at the police station. The Defendant was not handcuffed during the statement. Detective Parker's tone remained conversational. The Defendant was not confrontational. He was awake and alert throughout the

31

statement. He was not under the influence of any mental or physical distress or any substances. He never asked for a lawyer or to stop answering questions. The statement took only approximately 45 minutes. There was no extended questioning. The Defendant simply acknowledged that the items recovered were his and that he intended to sell drugs to the confidential informant. He also signed and initialed next to nearly every question on his statement after he reviewed the statement and made changes where necessary. Therefore, this claim is also without merit and must fail.

### 5. The Defendant's phone was searched pursuant to a valid search warrant. (Concise Statement Issue 6).

In his final issue on appeal, the Defendant makes two claims. First, that his passcode was illegally obtained and use to search his phone. As noted above, the Court specifically found that there was no search of the phone prior to obtaining a warrant, thus this claim is without merit. His second contention is that the warrant lacked probable cause and was based on stale information. This claim is likewise without merit.

It is well settled that probable cause for the issuance of a search warrant exists "where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." Commonwealth v. Leed, 186 A.3d 405, 413 (Pa., 2018) (citation and internal quotations omitted). "Affidavit for a search warrant is to be tested by this court with common sense and a realistic manner, and not subjected to

32

overly technical interpretations; the magistrate's determination of probable cause is to be accorded great deference on review." Commonwealth v. Vergotz, 616 A.2d 1379, 1382 (Pa. Super. 1992) (citations omitted). Stale information cannot provide probable cause in support of a warrant. The Superior Court has stated,

> [the] age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale and probable cause may no longer exist. Age alone, however, does not determine staleness. The determination of probable cause is not merely an exercise in county the days or even months between the facts relied on and the issuance of the warrant. Rather, we must examine the nature of the crime and the type of evidence.

Commonwealth v. Hoppert, 39 A.3d 358 (Pa. Super. 2012) (citing Commonwealth v. Janda, 14 A.3D 147, 158 (Pa. Super. 2011).

Instantly, the search warrant for the Defendant's phone contained sufficient probable cause. While the incident that provided probable cause for the search took place 13 months prior to the search, the information sought was information relating to those crimes that was still in existence at the time of the execution of the warrant. Law enforcement had custody of the phone from the date of the Defendant's arrest and could the evidence could not be accessed or altered as the phone was placed in airplane mode after it was seized by police. Therefore, this claim fails.

## IV. CONCLUSION

Based upon the foregoing, the Judgment of Sentence should be affirmed.

BY THE COURT:

**STEVEN T. O'NEILL          J.**

Copies mailed on 6/25/19
to the following:

Robert Falin, Esq. (District Attorney's Office)
Edward C. Meehan, Esq.

Judicial Assistant

34